## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

LOUIS GOLDBERG AND HOUDINISWAP LLC

           Plaintiffs,

    v.

LUKAS KACZMAREK, LOCAL NETWORK
KNOWLEDGE LLC, RENÉ VICIOSO, DHECA,
S.R.L., OLENA KOTLIARENKO, and JOHN
REUSING

           Defendants.

Case No. _____

**COMPLAINT**

Plaintiffs Louis Goldberg and HoudiniSwap LLC (collectively, "Plaintiffs") bring this action through counsel. On knowledge as to their own actions and otherwise on good-faith information and belief, Plaintiffs hereby allege against Defendants Lukas Kaczmarek, Local Network Knowledge LLC, René Vicioso, DHECA, S.R.L., Olena Kotliarenko, and John Reusing (collectively "Defendants") as follows.

## NATURE OF THE ACTION

1.    This case is about fraud, extortion, and a jaw-dropping breach of fiduciary trust. These acts were committed by Defendant Lukas Kaczmarek ("Luke"), a Maryland-licensed attorney, who ingratiated himself with Plaintiff Louis Goldberg ("Lou") and coaxed Lou to entrust him with highly sensitive information and legal advice concerning HoudiniSwap LLC ("HoudiniSwap" or the "Company"), the company Lou founded, built from the ground up, and wholly owns. In fact, Luke—along with his co-conspirators—was carrying out a carefully orchestrated scheme to seize ownership of HoudiniSwap from Lou and extort millions of dollars from Lou with threats and deception.

2.      Lou founded HoudiniSwap in 2023 and registered it as a limited liability company organized in St. Vincent and the Grenadines ("SVG") on January 27, 2023.  HoudiniSwap is an innovative online platform that connects holders of different cryptocurrencies and allows them to "swap" those tokens at the best possible exchange rate.

3.      Lou met Luke on June 5, 2023, through an introduction by Defendant John Reusing ("John"), a contract Sales Representative whom Lou had hired earlier in the year.  Lou and Luke became fast friends, and Luke further held himself out as a trustworthy attorney and advisor committed to protecting Lou's interests.  Lou trusted Luke, including allowing Luke to structure what Luke assured was a "nominee" arrangement in connection with Lou's ownership of HoudiniSwap.  Nominee arrangements—common in Commonwealth nations—allow a corporate owner to appoint another individual as a titular figurehead for public records purposes, allowing the owner to enjoy privacy and other corporate benefits.  Luke volunteered his mother-in-law, Defendant Olena Kotliarenko ("Olena"), to serve as the HoudiniSwap nominee.

4.      For years, Luke represented to Lou that Olena was acting validly as HoudiniSwap's nominee and that, under the arrangement, all economic ownership, power, and control over HoudiniSwap would stay with Lou.  Upon Lou's request, Luke routinely facilitated obtaining Olena's signature on relevant HoudiniSwap documents, furthering Lou's reasonable belief that Olena was only functioning as Lou's nominee.

5.      Lou's request for "a repository of the right agreements" to substantiate the nominee arrangement went unanswered for months.  Only in November 2024, as Lou began contemplating selling HoudiniSwap, did Luke assent to documenting Olena's role and authority as HoudiniSwap's nominee.  Luke purported to obtain the signature of Olena—whom Lou has never met—on the documents.  Relying on Luke's representations and qualifications as a licensed

-2-

attorney, Lou signed the documents, honestly and in good faith, believing that they only documented Olena's "nominee" status and that Lou retained full ownership and authority over HoudiniSwap.

6.      It all turned out to be a scam.  In November 2024, Lou and HoudiniSwap received a letter of intent from a private equity firm interested in acquiring HoudiniSwap for millions of dollars.  Luke and his co-Defendants' plot to seize HoudiniSwap and extort money from Lou then began to unfold.

7.      *First*, after months of resisting reducing the nominee arrangement to a writing, Luke induced Lou to execute a "Transfer and Assignment Agreement" and "Independent Contractor Agreement" that Luke assured Lou merely formalized and documented Olena's nominee role.  Relying on Luke's representations and counsel, Lou honestly and reasonably believed that the documents simply documented the nominee arrangement, and had no notion whatsoever that (as Luke months later would claim) he was transferring ownership and control over HoudiniSwap to Olena.  Indeed, neither Lou, Luke, nor Olena ever contemplated or discussed transferring ownership of HoudiniSwap to Olena, nor was any consideration exchanged to carry out such a transfer.  (The $10,000 "payment" referenced in the Transfer Agreement was never actually paid.)  The documents, therefore, were of no force or effect.

8.      *Second*, Luke began suggesting to Lou that he could soon make use of an "offshore" entity for HoudiniSwap's purposes.  This offshore entity turned out to be Defendant DHECA S.R.L. ("DHECA"), which, on information and belief, Luke controlled from his home in Bel Air, Maryland and ultimately used to defraud Lou.

9.      *Third*, Luke attempted to scuttle the private equity deal in January 2025, claiming that, under his auspices, he could arrange a far more lucrative sales process, guaranteeing Lou "$16

million upfront in your pocket plus options."  Again, Lou trusted Luke, including permitting Luke to access the deal's confidential data room to prepare an information memorandum to help sell the Company on Lou's behalf.  Notably, that memorandum (authored by Luke) acknowledged that HoudiniSwap "*is 100% owned by a single individual (the "Owner"), although a nominee owner does exist as permitted under Vincentian law*."

10.     *Fourth*, Luke's ostensible efforts to find a new deal for HoudiniSwap failed, leaving Lou on his own to find a new buyer.  Lou succeeded in finding a buyer, to which Luke claimed for the first time that, in order to "monetize" the proceeds from any sale, Olena could no longer be the nominee due to green card issues.  Luke suggested making himself the new nominee to circumvent that issue.  Thereafter, Luke went dark and stopped responding to Lou's calls and messages.

11.     Then, on May 15, 2025, Luke scheduled a meeting including Defendant René Vicioso ("Vicioso"), Luke's "business" partner and co-conspirator, at which their duplicitous plot was laid bare.  Luke and Vicioso demanded that in order for Lou to close the deal, they wanted 10% of all proceeds, and to be responsible for custodying the Company's sale proceeds through an incoherent trust structure set up through DHECA's bank accounts.  Lou did not agree to Luke and Vicioso's demands, suggesting that he was uncomfortable with that approach.  Then, on May 28, in a flagrant act of extortion, Luke threatened to report Lou to authorities with false and baseless charges unless Lou paid Luke $4 million immediately.

12.     Days later, Luke and Vicioso emailed all of HoudiniSwap's contractors and potential investors in one email with the subject line "Houdini Swap Under New Management," claiming they owned HoudiniSwap and that everyone is fired unless they promptly recognize DHECA as owner.  They continued to defame Lou's character, publicly accusing him of crimes

(without merit) and "firing" him, placing John as CEO.  Despite having repeatedly represented that Olena was solely a nominee, Luke claimed that Olena had transferred 100% ownership of HoudiniSwap to Luke, and that he had proceeded to "sell" the company (which he did not own) to DHECA.  Luke would go on to produce backdated documents purporting to memorialize the transfers of ownership from Olena to Luke and Luke to DHECA.

13.     Both purported transfers, however, were bogus:  Olena never owned HoudiniSwap and lacked any authority to sell it to anyone, let alone Luke.  All parties understood the arrangement's sole purpose was to install Olena as a nominee, with no transfer of actual ownership or control.  Luke repeatedly assured Lou that the documents he signed merely formalized this nominee role.  Indeed, just weeks earlier, Luke was actively advising Lou on selling his Company, promising to secure "$16 million upfront in your pocket plus options" for Lou's benefit.  Luke's fraudulently backdated agreements—claiming himself as the "owner" from January 20, 2025—directly contradict his ongoing role as Lou's advisor in the sale process, making it impossible for Luke to genuinely believe he, Olena, nor DHECA ever owned nor managed HoudiniSwap.

14.     What's more, there was no meeting of the minds between Lou and Olena to transfer ownership, nor was any consideration exchanged to legitimate the transaction.  Any supposed transfer of ownership from Lou to Olena was void *ab initio*.  Olena never had ownership over HoudiniSwap let alone the power to confer that ownership upon someone else.

15.     Luke intentionally and in bad faith induced Lou to sign the relevant documents with repeated assurances and representations (further legitimated by Luke's status as an attorney working to protect Lou's interests) that the documents memorialized only a nominee arrangement, nothing more.  Luke's assurances and representations are documented in dozens of messages exchanged between Lou and Luke over the relevant period.  Luke manipulated Lou into signing

the agreements with these bad-faith representations that Luke would later disavow. These fraud-induced agreements (and subsequent bad-faith transfers to Luke and DHECA) should all be declared void and of no force or effect.

16.     The scheme has not stopped there. Following the sham transfers, Luke and his cohorts have deliberately interfered with HoudiniSwap's business and operations, sending false and damaging communications to HoudiniSwap employees claiming ownership over the company. They also have stifled a sales process that was in its advanced stages. And they broke into HoudiniSwap's computer systems and stole valuable, proprietary trade secrets and confidential, commercially sensitive information.

17.     Armed with perceived leverage from their fraudulent claim of ownership and stolen HoudiniSwap records, Defendants laid bare their true aim—extortion—offering to "sell back" the company to Lou for a cash payment to which they are not entitled. Luke and his co-conspirators' conduct amounts to nothing less than criminal extortion.

18.     Since Luke's about-face, Lou has discovered that he is only the latest in a series of victims targeted by Luke, from whom Luke and his associates have defrauded and extorted money and whole businesses. Leveraging his network of so-called "wayward" clients in the crypto and arms-dealing communities, Luke and his associates have for years repeatedly engaged in wire fraud and extortion to steal funds from clients obtained through nominally legitimate business fronts.

19.     To date, Plaintiffs' efforts to resolve this matter have been unavailing. Defendants have met outreach from Plaintiffs' counsel by doubling down on their outlandish claim of ownership over HoudiniSwap and attempts to extort money from Lou. Accordingly, Plaintiffs

bring this action to hold Defendants accountable for their misdeeds, obtain redress, and put an end to Defendants' bad-faith extortion scheme.

20.     As detailed herein, Defendants are liable to Plaintiffs under a bevy of common law causes of action, including fraud, civil conspiracy, aiding and abetting, fraud in the execution, fraudulent inducement, breach of oral contract, tortious interference, breach of fiduciary duty, and legal malpractice.

21.     In connection with their fraudulent scheme, Defendants also have engaged in a pattern of racketeering activity, including numerous acts of wire fraud and extortion.  There is a severe threat that Defendants' illegal conduct will continue into the future, with Lou and others as targets, if not stopped here.  As such, Defendants' conduct violates the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c), (d).

22.     Additionally, Defendants are also liable to Plaintiffs for violating the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. §§ 1030(a), (b), by breaking into HoudiniSwap's computer systems to steal confidential and proprietary corporate records and information.

23.     To right Defendants' wrongs, through this action, Plaintiffs seek compensatory damages, punitive damages, treble damages under RICO, and declaratory and injunctive relief affirming that Lou is the rightful, sole owner of HoudiniSwap and barring Defendants from further interfering with HoudiniSwap's business or operations, and such further relief as detailed below.

## **PARTIES**

24.     Plaintiff Louis Goldberg is the founder and rightful owner of HoudiniSwap LLC. Lou is a resident of and domiciled in Ontario, Canada.

25.     Plaintiff HoudiniSwap is a limited liability company incorporated under the laws of St. Vincent and the Grenadines ("SVG").

26.     Defendant Lukas Kaczmarek is an attorney licensed in the State of Maryland.  At all relevant times, he has resided in Bel Air, Maryland.

27.     Defendant Local Network Knowledge LLC is Luke's business, which has been registered in Maryland since January 2023, and operates under the trade name LNK USA.  At all relevant times, LNK has maintained its principal place of business in Bel Air, Maryland.

28.     Defendant René Vicioso is Luke's business partner.  On information and belief, Vicioso resides in Dania Beach, Florida.  Vicioso has directly transacted repeat business with Luke in Maryland, including conspiring with Luke in Maryland to commit the acts complained of herein.

29.     Defendant DHECA S.R.L. is a company registered in Santo Domingo, Dominican Republic.  DHECA's registration lists both Luke and Vicioso as managers.  On information and belief, DHECA maintains its principal place of business in Bel Air, Maryland.

30.     Defendant Olena Kotliarenko is Luke's mother-in-law, and the purported HoudiniSwap nominee.  Olena is a recent immigrant from Ukraine, and at all relevant times has resided in Bel Air, Maryland, with a green card.

31.     Defendant John Reusing is Luke's business partner and the purported new CEO of HoudiniSwap.  John resides in Glen Arm, Maryland.  John has directly transacted repeat business with Luke in Maryland, including conspiring with Luke in Maryland to commit the acts complained of herein.

## JURISDICTION AND VENUE

32.     This Court has federal question jurisdiction under 28 U.S.C. § 1331 because Plaintiffs assert civil claims arising from RICO, 18 U.S.C. §§ 1962(c), (d), and the CFAA, 18 U.S.C. §§ 1030(a), (b).  This Court also has supplemental jurisdiction over Plaintiffs' related state-law claims under 28 U.S.C. § 1367 because those claims are so related to the federal claims that they derive from a common nucleus of operative facts.

33.     This Court may exercise personal jurisdiction over Defendants Lukas Kaczmarek, Local Network Knowledge ("LNK"), Olena Kotliarenko, and John Reusing because each resides in or is incorporated in the State of Maryland.  This Court may also exercise personal jurisdiction over these Defendants because each engaged in the tortious conduct alleged herein in the State of Maryland.

34.     This Court may exercise personal jurisdiction over Defendants René Vicioso and DHECA S.R.L. because each has transacted business or contracted (albeit fraudulently) with Defendants Lukas Kaczmarek and Olena Kotliarenko within the State of Maryland.

35.     This Court may further exercise personal jurisdiction over Defendant DHECA S.R.L. because, on information and belief, DHECA maintains its principal place of business in Bel Air, Maryland.

36.     Venue is proper under 28 U.S.C. § 1391 because, among other reasons, all Defendants reside, are found, and/or transact their affairs in this District.

## FACTUAL BACKGROUND

I.     **Lou Creates HoudiniSwap, an Innovative New Cryptocurrency Service**

37.     At the ripe age of 29, Lou Goldberg had a simple yet effective idea:  what if there were a service like Booking.com that allowed the active cryptocurrency community to directly swap different kinds of tokens at the best possible exchange rate?  Similar to Booking.com and other online aggregation platforms, Lou's idea was to connect hundreds of cryptocurrency swap venues together, offering thousands of cryptocurrency pairs to be swapped at the best value, through one domain.  Thus, for example, users could swap Bitcoin for Ethereum in one seamless transaction, rather than price-compare rates across hundreds of other venues.  In return for providing this service, Lou, on the back end, would earn a commission back from the swap venue. From this idea, HoudiniSwap was born.

38.    In January 2023, Lou registered HoudiniSwap as a software development limited liability company in SVG, an island nation in the Caribbean.  He paid the corporate registration fee on January 16, 2023.  As part of the Company's formation, Lou registered its office at 78 Halifax Street, 3rd Floor, Kingstown, St. Vincent and the Grenadines, and further appointed Cosmos Trust Limited as the Registered Agent for the Company at that address.  On January 27, 2023, Lou received a Certificate of Formation from the SVG Companies Registrar, which identifies Lou as the sole member.  Lou also executed HoudiniSwap's first Limited Liability Company Agreement, dated January 27, 2023, which reflects that he is the sole member and manager of HoudiniSwap, and that he made a $10,000 capital contribution to fund its operations.

39.    From its inception, HoudiniSwap grew rapidly.  As of June 1, 2025, the Company had almost two dozen contractors around the world working to develop and execute on Lou's vision, including a Chief Executive Officer, multiple software developers, and customer support personnel.  As a testament to Lou's success in getting the Company off the ground, he recently negotiated and obtained a multi-million-dollar term sheet from an Ontario-based public company to purchase HoudiniSwap.  Lou's ability to sell HoudiniSwap, however, has been placed in severe jeopardy as a result of Defendants' tortious and illegal conduct described below.

**II.    Lou Entrusts Luke to Set Up a "Nominee" Arrangement for HoudiniSwap**

40.    Lou first met Luke by way of introduction from John on June 5, 2023.  Luke, a Maryland-licensed lawyer, was purportedly looking to help existing clients sell off their cryptocurrency holdings.  John, who at the time worked for Lou as a contracted Sales Representative at HoudiniSwap, claimed to have worked with Luke in the past and was personal friends with him for several years.

41.    Lou connected Luke with regulated over-the-counter cryptocurrency trading desks, which assisted Luke's clients with selling their cryptocurrency holdings and successfully closed

two transactions.  Through these successful and lucrative deals, Lou was optimistic that Luke could be a reliable friend and business partner in future opportunities.

42.    Over the next two years, Lou sought and received legal advice from Luke, including by relying on Luke to advise him on corporate taxation issues, to manage corporate governance issues, and to review and draft commercial agreements.  As described further below, with each of these proposals, Luke reaffirmed that he was acting in Lou's and HoudiniSwap's best interests.

43.    On October 11, 2023, Lou reached out to Luke for his assistance in establishing a "nominee shareholder" arrangement for HoudiniSwap, in which a "nominee" would hold record ownership of HoudiniSwap and assist with administrative tasks for Lou's benefit.  Lou, meanwhile, would maintain beneficial ownership and actual control of the Company.

44.    Such nominee arrangements are recognized corporate governance measures utilized in British Commonwealth nations and other jurisdictions.  In Canada, for example, where Lou is domiciled, nominee shareholder arrangements are frequently employed by business owners for enhanced anonymity and privacy, facilitating foreign ownership, and streamlining corporate governance.  Nominee arrangements are also commonly utilized in St. Vincent and the Grenadines, another Commonwealth nation, where HoudiniSwap is registered.

45.    In an October 11, 2023 exchange, Lou asked Luke for help locating a potential nominee based on Luke's representations about the breadth of his international contacts, as well as Luke's assurances that he would serve as an intermediary to ensure Lou would get the assistance he needed from any such nominee.  Luke agreed to help Lou identify potential candidates who

would serve as a "nominee" for Lou's ownership of HoudiniSwap:

> **Lou Waroo**    23:33
> hey question for yah
> asking for a friend... would like to get a "nominee shareholder"    23:34
> for a st. vincent company
> any ideas?    23:34

> **Luke K**    23:40
> In reply to this message
> Any ideas about the concept or about an individual for that role?

> **Lou Waroo**    23:46
> st vincent has no records of shareholders or directors
> just need someone to file their name as the owner of a company    23:46
> in case of audit or in case of signing is needed for investment or    23:46
> something
> so the person needs to be available    23:46
> but it's really a zero commitment    23:47

> **Luke K**    23:47
> Are you asking me to set your friend up in SVG?

> **Lou Waroo**    23:47
> hahah no
> I'll be more clear    23:47

> **Luke K**    23:47
> Totally get it
> Sure I can help    23:48

> **Luke K**    23:49
> It's just a matter of annual filings and answering the phone

> **Lou Waroo**    23:49
> yeah that's literally it
> maybeee a signature if a huge investor comes along    23:49
> or a big exchange or something    23:50
> I'm just poking around now to find someone    23:50
> but you seem to know a lot of people haha    23:50
> I'm hoping to not spend more than 2k per year on it though    23:50

> **Luke K**    23:51
> Nominee shareholder doesn't need to be a resident

> **Lou Waroo**    23:51
> correct
> and it's a zero tax jurisdiction, so there is extremely little risk    23:51

> **Luke K**    23:53
> Bruh
> Call me    23:53

46.     Over the following three months, Lou repeatedly followed up with Luke to identify individuals who could serve as a HoudiniSwap nominee.  In November 2023, for example, Lou and Luke had several conversations concerning potential candidates, after which Luke followed up, assuring Lou that he had potential backup options available.



47.     As part of this process, on December 6, 2023, Lou asked Luke to also provide know-your-customer ("KYC") identifying information for any nominee to comply with regulatory requirements.



48.     One month later, on January 5, 2024, Lou again followed up with Luke, asking for the status of the nominee search.



49.     Finally, on January 7, 2024, Luke presented Lou with a potential nominee:  his

mother-in-law, Defendant Olena Kotliarenko.



50.     Olena is an elderly woman who recently moved to the United States from Ukraine and resides in Maryland with a green card.  On information and belief, she speaks little or no English and is not technologically literate.  Therefore, on January 8, 2024, when assuring Lou that Olena would be a suitable nominee, Luke explained he sought "signatories for whom I can perform on [their] behalf"—namely, someone "pliable" and where Luke would be responsible to HoudiniSwap for "full-service communications availability":



51.     Ultimately, Lou consented to Olena serving as HoudiniSwap's nominee, based on Luke's advice as an attorney.

## III.   Luke Fosters Lou's Belief that a Valid Nominee Arrangement Exists with Repeated Representations and Assurances

52.     Beginning on January 8, 2024, Olena—by and through Luke—began executing documents on HoudiniSwap's behalf as HoudiniSwap's nominee.

53.     Over a series of phone calls, Lou asked Luke whether to formally memorialize Olena's role as HoudiniSwap's nominee, acting solely on behalf of and for the benefit of Lou and HoudiniSwap.  But Luke refused, claiming falsely that it would be a "bad idea" if such a document "ended up in the wrong hands."   Lou trusted Luke and accepted his ostensible legal advice, believing that Luke had effected a valid nominee arrangement for HoudiniSwap.

54.     Notwithstanding the lack of formal documentation, on or around January 13, 2024, Luke verbally confirmed that the nominee arrangement was settled.  Consequently, over the next several weeks, Lou began directing Olena via Luke to take actions consistent with a nominee relationship, including directing them to execute agreements with Olena's name for HoudiniSwap's benefit.

55.     For example, on January 14 and 17, 2024, Lou directed Olena and Luke to execute a services agreement with MEXC, a prominent cryptocurrency exchange, on HoudiniSwap's behalf through which HoudiniSwap could operate its swap operations.





56.    Over the first six months of 2024, Luke continued to execute, on Olena's behalf as HoudiniSwap's nominee, any and all documents Lou sent to him without question or review, and always at Lou's direction.  Throughout this process, Luke would always confirm with Lou which documents needed to be executed.  This continued approximately 20 times within this period.

57.    Luke's willingness to sign documents was met with an unwillingness to draft documents.  On February 10, 2024, Lou directly requested of Luke to "go through some key documentation and make sure we have a repository of the right agreements."  Preying on Lou's vulnerability as a young entrepreneur and relying on Luke's stature as a licensed U.S. attorney, Luke called Lou and deliberately advised, yet again, against having formal nominee documentation, citing it as a "bad idea."  Lou accepted Luke's advice because, ultimately, Lou retained full control over the Company, its decisions, operations, personnel, and treasury.  Plus,

there was a clear, written communication contextualizing the arrangement.



58.     Luke also continued to treat Lou as HoudiniSwap's owner, and held himself out as Lou's attorney and tax advisor.  For example, in February 2024, Luke inquired about HoudiniSwap's executive structure to ascertain how to minimize potential tax liabilities to Lou and the Company.  In particular, Luke emphasized Canada's "Mind and Management" analysis of where executives are located and how taxes may be assessed accordingly.  While Lou did not accept any of Luke's proposals, Luke continued to falsely reaffirm that he was trying to work in Lou's and HoudiniSwap's best interests.

59.     Additionally, in messages sent on February 18, 2024, Luke—while advising Lou of "Mind and Management" principles—continued to reaffirm that HoudiniSwap was operating under a nominee arrangement, with Olena serving as HoudiniSwap's nominee.

60.     Over time, however, Luke began subtly advocating for more control over HoudiniSwap.  For example, on February 18, 2024, Luke—under the guise of tax advice—suggested that Lou reorganize HoudiniSwap with a share issuance, and for tax purposes, to retain only 46% to avoid any controlling shareholder tax implications.  In concert with this plan, Luke proposed "assign[ing] 9% to me," purportedly to "provide a method of wresting back control of the company should something go awry with the directors/board."  He nonetheless insisted that "our interests are tied together and thus we'd have the same alignment on decisions."  He further

suggested that "[t]he best place for Olena would then be the director of [Houdini Holding Company]." Lou ignored this suggestion. Around this time, Luke also suggested including his wife, Olena Kazcmarek, as a Manager to HoudiniSwap. That suggestion, however, was never taken or implemented.

61.     By April 2024, Luke began introducing to Lou the concept that Olena (his mother-in-law) could act as a "beneficial owner" of HoudiniSwap. Relying on Luke's role as his attorney, Lou assented.



62.     On April 8, 2024, Luke proposed a self-dealing structure in which his company, Defendant LNK, would serve as an "off-ramp" for HoudiniSwap to facilitate payments to vendors that did not accept cryptocurrency. That way, Luke "could pay via [his] company credit card as business expenses."



63.     By mid-year 2024, it was well-established that Luke, on Olena's behalf, would execute documents for HoudiniSwap—always and only at Lou's express direction.  For example, on June 6, 2024, Lou directed Luke to send an email from Olena's HoudiniSwap account to terminate HoudiniSwap's contracts with its market makers.



64.     And on July 1, 2024, Lou was forced to remind Luke and Olena to execute documents that he had circulated to them on June 18, and asked to address "the backlog of Olena's agreements."  In each case, Luke confirmed that he is "[a]ready on top of it my friend" and that

executing the documents was "quite literally on my to-do list."



## IV. Luke Orchestrates Fraudulent Documentation for the Nominee Arrangement After Third-Party Interest Emerges for a Potential Acquisition of HoudiniSwap

65.     Luke's maneuvers became bolder as HoudiniSwap grew.  By May 2024, HoudiniSwap had grown into a successful business with significant marketable potential.  On May 13, 2024, Lou began entertaining selling the Company, and reached out to Luke to assist with "get[ting] organized in advance of a potential exit."

66.     As part of these discussions, Luke identified documents needed to memorialize HoudiniSwap's corporate structure.  The first, drafted by Luke and reviewed by Lou on September 9, 2024, was HoudiniSwap's First Operating Agreement, which omitted any mention of Lou, contradicting Lou's initial setup as the sole owner and manager.  Luke assured Lou this was standard for a nominee arrangement, insisting Lou's name was unnecessary since he retained full

control.  Relying on Luke's expertise as a licensed attorney, Lou agreed to have Olena sign the document.  With HoudiniSwap's internal operating agreement established, Lou was able to begin marketing HoudiniSwap to potential bidders.

67.    Throughout this period, Lou had complete trust in Luke, which Luke continued to engender to keep Lou and his resources close.  For example, on September 20, 2024, when discussing a separate bridge loan transaction with another of Luke's clients (which, as discussed below, was later revealed to be another scam), Luke assured Lou, "I cannot tell you how much it means to me that you've placed your trust in me to this extent, and I absolutely will not abuse that trust."  He separately claimed that the "linchpin [*sic*] of my business viability is my trustworthiness and honesty."  Finally, Luke avowed, "I can and do swear and attest that I have been, am, and will always keep acting in good faith in everything we do."



68.    In response, Lou affirmed that he had "full faith" in Luke and that while "[w]e don't have many years of history," "we have quite a lot of experience together and I absolutely trust you 1,000%."

69.    On November 6, 2024, Lou received a Letter of Intent from a private equity firm. Lou shared the news promptly with Luke, believing that Luke would assist with moving the deal forward.



70.    In preparation for the potential transaction, Lou relied on Luke's advice as his attorney to identify documents needed for the private equity deal under the nominee structure Luke had established.  Luke explained that a private equity firm would never complete a deal unless the nominee structure was properly documented.  He continued that the way to do so was to have Olena represent the company "on paper" as if she owned it.  Despite consistently portraying Olena as a mere nominee and signing on her behalf, Luke deliberately misled Lou into attaching inappropriate language described below, and ultimately executing agreements that Luke would later claim transferred full ownership and control to Olena, falsely presenting them as "reorganization" documents to protect Lou's interests and facilitate the deal.

71.    At Luke's request, Lou then engaged a junior Toronto lawyer to draft a "Minute Book" memorializing corporate actions and resolutions authorizing Olena to sign documents. Luke then misled Lou about the types of documents that had to be drafted, which was then relayed

to the junior lawyer to draft documentation that Luke would assert (months later), effectuated a transfer of ownership to Olena.  Trusting Luke's counsel and his representations and assurances that only a nominee relationship was being memorialized, Lou would go on to sign the documents as advised by Luke.

72.    *First*, on November 13, 2024, Luke had Lou execute a "Transfer and Assignment Agreement."  As drafted, the documents asserted that an undefined "Assignor"—presumably Lou—was "acting as agent for [Olena]" when he was listed as "the sole registered member of the Company" in its LLC formation documents.  It also claimed that Lou was "holding such Member interest for and on behalf of [Olena]," who was "the true and beneficial owner thereof."  This document further purported that the "Sale, transfer, assignment and conveyance of the Member interest by [Lou]" to Olena was in exchange for a cash payment by Olena to Lou of "seven thousand five hundred ($10,000) [*sic*] dollars in cash in United States dollars [*sic*]."  In reality, no payment was ever made by Olena (or Luke) to Lou.  Nor was there any indication that Olena ever reviewed, understood, or agreed to any of the terms set out in the "Transfer and Assignment Agreement."  There is no evidence that Olena even reviewed or signed the document:  to date, Luke had been signing documents on Olena's behalf.  The document itself was illogical, and showed no mutual assent, given that Luke backdated the agreement to January 28, 2023—***more than five months before Lou and Luke even met on June 5, 2023***.

> This **TRANSFER AND ASSIGNMENT AGREEMENT** (the "**Agreement**") is entered into as of January 28ᵗʰ, 2023, by and among Louis M. Goldberg, an individual residing in the City of Toronto, Ontario, Canada, as transferor (the "**Transferor**"), and Olena Kotliarenko, an individual residing in the City of Odessa, Ukraine, as transferee (the "**Transferee**").

73.    The agreement date is almost ***one year before*** Lou even knew of Olena's existence.

74.     *Second*, on the same day, Luke had Lou sign a purported "Independent Contractor Agreement," again under the guise that it would memorialize the HoudiniSwap nominee arrangement.

75.     *Third*, also on the same day, Luke had Olena sign (or he signed on her behalf), as the "Sole Member" of HoudiniSwap, a series of corporate resolutions (a) purportedly ratifying Lou's supposed transfer of HoudiniSwap's ownership to Olena, and (b) purportedly ratifying Lou's resignation  (the "HoudiniSwap Resolution") as the initial Manager of the Company and installing Olena as the new Manager of the Company.

76.     Luke then turned his attention to the potential sale of the Company.

**V.     Luke Offers to Find a Buyer for Lou's Company in Return for a Fee**

77.     To that point, Lou's negotiations with the private equity firm were advancing slowly.  However, in January 2025, Luke separately insisted that "the offer is undervalued" and that Luke needed "to shoot Anthony [of the private equity firm] in the face to delay this transaction" because Lou was "tremendously underselling [himself] here HOT DAMN."

78.     One week later, Luke approached Lou to offer sourcing a potential buyer for HoudiniSwap himself.  In doing so, Luke assured Lou that "my rock bottom absolutely lowest

acceptable price for [HoudiniSwap] is $16 million upfront in your pocket plus options."



79.    During this time, Luke continued to represent to Lou that the HoudiniSwap nominee arrangement remained in place.  In an investment memo Luke prepared on January 23, 2025, to begin marketing the Company to potential bidders, he noted, "[t]he company is 100% owned by a single individual (the "Owner"), although a nominee owner does exist as permitted under Vincentian law."

**STRUCTURE**

HoudiniSwap LLC is a limited liability company domiciled in Saint Vincent and the Grenadines. The company is 100% owned by a single individual (the "Owner"), although a nominee owner does exist as permitted under Vincentian law. No independent board of directors currently exists. The executive team consists of four main individuals, and there are several additional employees retained in specific roles. The personnel requirements for HoudiniSwap are exceptionally lean for the volume and value of business transactions completed using the Project's interface. All technical-related expertise is managed through affiliated services, including ongoing development.

80.    By the end of January 2025, Luke reported that he was receiving positive feedback from his investor network.  Luke began selling Lou on the notion that he could obtain a sale price of approximately $20 million to $30 million for HoudiniSwap, all while recognizing that Lou is the beneficial owner of HoudiniSwap with "retention by [Lou] of 15% ownership" in addition to

the sale price.



81.    Following a January 30, 2025 discussion about a potential sale of HoudiniSwap (including one structure in which Luke would raise funds to acquire the Company himself), Luke reiterated his pitch that he could obtain a $40 million valuation for HoudiniSwap, and continued

to reaffirm his understanding that Lou remained the rightful and beneficial owner of the Company.



82.     Around that time, a clerical error caused HoudiniSwap's SVG registration to lapse. Using Luke to sign for Olena as HoudiniSwap's nominee, Lou had the Company re-registered with the SVG Companies Registrar on January 29, 2025.  Later, in May 2025, Luke fraudulently backdated the purported transfer agreements from Olena to himself, along with Olena's resignation, to January 20, 2025—a date when HoudiniSwap had been struck from SVG's Company Registrar (from January 1 to January 23, 2025) and thus legally nonexistent.  This illogical backdating further invalidates Luke's baseless ownership claims and underscores the

sham nature of the entire scheme.



83.    Luke continued to falsely assure Lou that he was operating in Lou's best interest across dozens of messages exchanged during this period.  For example, when speaking about brokering HoudiniSwap's sale, Luke messaged Lou:  "I really appreciate your candor in our discussions, and I hope that I can continue to demonstrate to you that I am acting in good faith at all times, even when it comes to contentious issues.  You've been nothing but honest, loyal, and reliable since we've met, and I hope that I have displayed those qualities in a reciprocal fashion to

you."



84.    Yet when, on February 4, 2025, Lou suggested involving a separate team of deal

lawyers at Morrison Cohen ("MC") to consider potential structures, Luke balked.  Using crude

language, Luke insisted on maintaining control over any negotiations.



## VI.    The Scam Is Revealed

85.    As time wore on, it became evident to Lou that Luke would be unable to secure any potential bona fide bidders.

86.    For example, on or around March 5, 2025, Luke approached a boutique investment bank as a potential buyer.  However, the investment bank was not a credible buyer:  it was an advisory firm, not a private equity firm or any other kind of acquisition company.  Additionally, Lou independently knew Luke's proposed contacts at the company from his prior career, and understood they were not investors.  Luke's ill-found "suitor" gave Lou doubts that Luke knew what he was doing.

87.    Later, on March 13, 2025, Luke reported that he "received my first term sheet!" but admitted that "[i]t's not exactly what I'd expected" as it only committed to "token purchases up to a total value of $10 million."

88.     At that point, Lou began to realize that Luke saw him as a potential cash cow from whom Luke believed he could earn a significant commission if he were able to sell HoudiniSwap at the right price.

89.     Luke also began approaching Lou for new opportunities, particularly to make use of Luke's company in the Dominican Republic—Defendant DHECA.  For example, on February 21, 2025, he asked for Lou's help to "onboard with OKX so we can tap into those trading bots." On March 28, 2025, Luke claimed that he set up DHECA to accept cryptocurrency transactions on behalf of U.S. customers.

90.     Finding that Luke was making little progress on finding a bona fide acquirer for HoudiniSwap, however, Lou reinitiated his own search.  In April 2025, Lou was able to secure a Letter of Intent from a principal at an Ontario-based public company to acquire HoudiniSwap.

91.     When it became clear that Lou could move forward with his own transaction—one with which Luke had no involvement—Luke began creating new hurdles for Lou to close on the deal.

92.     In text messages on May 1 and 2, 2025, Luke claimed that Olena could no longer serve as HoudiniSwap's nominee for any "monetization" due to her immigration status and failure to file foreign ownership reports.  He also claimed she was sickly and hospitalized, rendering her unable to sign documents.  Insisting "[Olena's] involvement must end immediately" while offering to "have some ideas about what we can do and I can help you manage it if you want," Luke pushed to assume the nominee role himself.  Lou never agreed to this, though he facilitated an introduction to "Evan," a young attorney who had been promoted to HoudiniSwap General Counsel.

93.     With the public company buyer signaling a closing in under three weeks, and Olena's role limited to a mere signatory, Lou viewed any shift to Luke as a simple formality, and

definitely not a transfer of ownership or control.  When introduced to Evan later that day, Luke

reaffirmed his status as Lou's attorney in writing, and during an introductory call on May 5, 2025,

Luke downplayed the nominee change as merely an advantageous tax structure for Lou.



94.    After that conversation, and in reliance on Luke's representations about

HoudiniSwap's nominee structure, Evan prepared a "very bare bones form that could be used" by

Luke to memorialize the nominee arrangement.

95.    Luke nonetheless authored and executed yet another set of "Transfer and

Assignment Agreement" documents and corporate records—this time, effecting a purported

ownership transfer from Olena to himself.  Luke did not have Lou's consent to execute them.

Unbeknownst to Lou, Luke once again backdated all of the documents—this time, to January 20,

2025.  The document metadata, however, showed that Luke authored the documents on May 6,

2025.  The documents also showed that no monetary consideration was given by Luke in seizing

purported control of HoudiniSwap.

96.     The next day, on May 7, 2025, Luke authored further documents purporting to transfer ownership of HoudiniSwap *again* from Luke to DHECA S.R.L.  These documents also were not drafted in good faith because Luke did not have Lou's consent to author or execute them. The documents also purported to install Luke's business partner, René Vicioso, as the sole Manager of HoudiniSwap.  Once again, the documents showed that no monetary consideration was exchanged by DHECA in its purported acquisition of HoudiniSwap's ownership.

97.     Subsequent to these transfers, on May 15, 2025, Luke scheduled a meeting among himself, Vicioso, and Lou.



98.     On that call, Luke and Vicioso demanded that in order for Lou to close the deal, they wanted 10% of all proceeds, and to custody the Company's sale proceeds through a complex Dominican trust structure that Lou could not understand.

99.     Lou firmly rejected Luke and Vicioso's demands, expressing discomfort with their self-serving approach.  Luke attempted to gaslight Lou, insisting there was no cause for concern

and suggesting Lou simply misunderstood the tax benefits, claiming the 10% fee would ultimately save Lou more in taxes than it cost.

100.     On May 19, 2025, a second call—including Evan—was scheduled to address Lou's valid concerns about the fee.   On that call, Vicioso turned hostile, belittling Lou for not appreciating Luke's purported help.   The next day, Luke persisted by probing for access to all of Lou's corporate tax records, disguising it as "an excellent plan" that was "so good you couldn't rationally refuse."

16 May 2025

**LW**   Lou Waroo     02:25
Hey I'm good anytime tomorrow for a call to continue the convo

If possible, plz block off any 30-60 min slot for little old me   02:25

**LK**   Luke K     02:44
Let's do on Tuesday so I have time to prepare – I have an excellent plan sketched out that's so good you couldn't rationally refuse

I will need your numbers for your Canadian companies, as well as   02:45
how you ended up paying taxes for 2024

Or at least, that would help the accuracy of the numbers   02:45

But you will be over the moon when you read the numbers   02:45

101.     But there was no such plan.   In reality, Luke began breaking into HoudiniSwap's password-protected Google Drive, a cloud-based storage space accessible only via the Internet, in which all of the Company's files and records are stored.   On information and belief, Google's data centers, which maintain HoudiniSwap's Google Drive account, are located in the United States.

102.     Luke had no right or authorization to access HoudiniSwap's Google Drive, yet it was uncovered through external forensic analysis that on May 22, 2025, through Olena's old email account that Lou established, Luke downloaded, shared, created, deleted, and viewed 222 internal, confidential and proprietary documents.   Luke continued to delay any substantive conversations with Lou until he had the documents he believed he needed to execute on his fraud and extortion against Lou.

103.     And for any phone calls that Lou proposed, Luke demanded that Vicioso join as a participant.



104.     Finally, on May 28, 2025—with HoudiniSwap's multimillion-dollar sale just weeks from closing—Luke betrayed Lou's trust in a shocking phone call that revealed the extent of his fraudulent scheme.  Believing Luke to be a close friend and trusted attorney, Lou was stunned when Luke erupted in manic rage, screaming threats to report him to authorities for baseless crimes like "embezzlement" unless Lou immediately paid him $4 million.

105.     Spitting with rage, Luke falsely claimed DHECA owned HoudiniSwap and demanded the payment to avoid fabricated criminal charges.  "**LISTEN TO ME. YOU'RE TOO LATE. YOU NEED TO PAY ME BY TONIGHT,**" Luke screamed before hanging up, leaving Lou deeply shaken by the abrupt turn from ally to extortionist.  As a result of this call, on

information and belief, Vicioso—on behalf of DHECA—was fully aware that the purported transfer to DHECA was fraudulent and invalid.

## VII.    Falsely Claiming Ownership, Defendants Interfere with HoudiniSwap's Business and Attempt to Extort Money from Lou

106.    Following this extortionate threat, on May 30, 2025, Vicioso—with HoudiniSwap's stolen files in hand—contacted HoudiniSwap's SVG agent, Cosmos Trust, demanding Cosmos update the SVG Registrar to reflect that DHECA was the new record owner of HoudiniSwap.  To date, Cosmos has refused to do so, questioning the validity of the documents Luke authored.  On information and belief, Vicioso's interaction with Cosmos was coordinated with Luke's threat, and Vicioso and DHECA were always participants in the scheme.

107.    And on June 1, 2025, Vicioso sent a Company-wide email to HoudiniSwap's contractors.  In that message, he declared "DHECA S.R.L." to be the "Sole Member of HoudiniSwap" and claimed that "certain bad actors within (or acting within) the organization appear to have engaged (and/or continue to engage) in behaviors and practices in clear violation of the Company's policies and procedures," including "potential financial criminal activity (e.g. money laundering, embezzlement, theft, and/or fraud)."  As a result of this "investigation," Vicioso purported to install Defendant John Reusing as CEO and "fired" Lou.  John had not worked with HoudiniSwap since being terminated on February 14, 2024.  *In a clear effort to destroy Lou's prospective deal, Vicioso further copied representatives of the potential future buyers at the Ontario public company on this email.*

108.    Throughout June 2025, John and Vicioso attempted to solicit active HoudiniSwap contractors to DHECA's scheme.  All such attempts were rightfully ignored.

109.    Luke's allegation of wrongdoing is, of course, baseless.  HoudiniSwap is Lou's company.  Lou maintained full operational control and is recognized by everyone as the true

owner.  Moreover, all of the revenue generated by the Company remains in its treasury, in an account that Lou alone controls.  HoudiniSwap maintains meticulous corporate and accounting records that demonstrate the falsity of Luke's allegations.  Indeed, Lou has never taken a distribution from the Company.

110.    It is clear that Luke leveraged information he obtained from Lou as his attorney to further an extortion scheme.  And the timing is hardly coincidental—Lou had obtained a potentially lucrative offer from a significant Ontario public company, which offered to pay Lou millions of dollars upon closing, plus additional royalties and equity.  Thanks to Luke and his associates' interference, that deal now will not proceed, costing Plaintiffs an estimated $12 million in sales proceeds.

## VIII.    Defendants Meet Outreach by Plaintiffs' Counsel with More Attempted Extortion

111.    Lou has been forced to retain counsel, both in Canada, the United States, and SVG to vindicate his rights, including to reaffirm his bona fide ownership of HoudiniSwap.  To date, he already has incurred in excess of $189,211.96 in fees and related expenses as a result of Defendants' fraudulent and tortious conduct, including no less than $5,000 in fees and expenses to investigate and remediate the harm caused by Luke's unauthorized access into, and theft of the Company's confidential materials from, HoudiniSwap's Google Drive account, including $1,950 for a forensic analysis and a further $15,000 to consultants to address the harm caused by Luke and Vicioso.

112.    On June 1, 2025, Plaintiffs' counsel sent to Luke, Vicioso and their cohorts a cease-and-desist letter, demanding that they refrain from any further efforts to claim HoudiniSwap as their own company.  This letter went unanswered.

113.    On July 2, 2025, Plaintiffs' counsel sent another cease-and-desist letter.  Nonetheless, Luke, Vicioso, DHECA, and John have not desisted or disavowed their claim of

ownership over HoudiniSwap. Rather, in a July 2025 call with Plaintiffs' counsel, Luke reiterated his position that DHECA owns HoudiniSwap, but offered to resolve the matter in exchange for an unspecified cash payment. Thus, Luke's extortionate motive was laid bare once again.

## IX. Lou Is the Latest Victim of a RICO Enterprise Comprised of Luke, LNK, Vicioso, DHECA, and John

114. Lou always has been HoudiniSwap's sole and rightful owner. At all times, Lou has had true ownership and operational control over the Company, including record ownership and direct control of the Company's treasury, records, operations, personnel, and intellectual property.

115. Lou is now also a victim—of a years-long confidence scheme to extract (and, absent Lou's cooperation, to extort) money and opportunities under the guise of friendship and legal counsel. Lou has been harmed repeatedly by Defendants' misconduct, suffering pecuniary loss and actual and imminent injury from Defendants' interference with HoudiniSwap and its business and Defendants' wrongful claim of ownership over the Company.

116. Following Luke's about-face in May 2025, Lou began piecing together the truth: that Luke and his associates' entire business model was, in fact, a racketeering enterprise, whose purpose was to steal funds from Luke's ever-growing "network" of cryptocurrency and arms-dealing contacts.

117. On information and belief, Luke and Vicioso began working together as arms suppliers for Ukraine in or around early 2022. From this partnership, an enterprise emerged.

118. Since no later than January 2023, Luke has fronted himself as an advisor offering "deep crypto clients (*i.e.*, clients heavily involved in crypto and not in conventional finance) a guided legal pathway for them to 'withdraw' from that space." Luke boasts he is no longer a "shady arms-dealing country-destabilizing crypto-slinging rogue attorney," but is now the

"ultimate do-gooder social worker cum cleric guiding those wayward users of non-funny money back to the path of righteousness."

119.    Leveraging Luke's contacts, Luke, Vicioso, and John have carried out their own separate scheme of assessing potential opportunities to steal monies from otherwise "wayward" clients.  For example, in April 2024, Luke orchestrated financing for one of his clients.  The client sought $2.5 million in a capital raise to finance the acquisition of manufacturing equipment to fulfill a $20 million contract for a customer.  Luke helped raise the funds, including by obtaining a $500,000 bridge loan via USD stablecoin from Lou to pool with the rest of the funds.  Luke claimed to Lou that the loan was over-collateralized, and that Lou would enjoy a 2x return on his loan.

120.    In reality, however, Luke had used privileged due diligence materials he obtained as a lawyer to forge documents giving himself control over the client's manufacturing contract. He then contacted the client's customer directly and falsely represented that the proceeds for the $20 million contract must be paid to an offshore account in Croatia that Luke established for himself.  Finally, Luke, using his falsified documents, took out $750,000 in loans against the client's company.

121.    When, in or around September 20, 2024, the client confronted Luke, Luke filed a lawsuit against him and coerced him into a $1.5 million settlement.

122.    On information and belief, Luke, in coordination with one or more of Defendants LNK, Vicioso, DHECA, and/or John, has defrauded multiple other individuals in a virtually identical manner.  Indeed, Lou was also a victim in that same scheme.  Luke falsely assured Lou in multiple WhatsApp messages that he would net a 100% profit for his $500,000 loan.  Not only has Luke not paid any of this purported "profit," but Luke further lost $150,000 of Lou's principal.

He did so by allegedly converting Lou's $500,000 of USD stablecoin into Ethereum, a volatile asset, without Lou's consent. He then claims to have attempted to "yield farm" Lou's $500,000 worth of Ethereum tokens by trying to capture yield on Ethereum and keep excess profit for himself. However, Luke apparently miscalculated, and ended up losing $150,000 and calling it a "conversion error."

123.     Lou is not Luke's only victim of wire fraud and extortion, and is unlikely to be the last. Victims may not be limited exclusively to individuals or corporations. Based on reasonable belief, Luke was referring to himself as the "alleged someone," when he wrote to Lou: "bro back at the start of the Russian invasion SOMEONE I KNOW ALLEGEDLY wholesale fabricated Ukrainian government procurement documents to get arms past the border without trouble" and then clarified "you'd be surprised how flexible people can be with documents." On information and belief, Luke, in concert with LNK (his purported legitimate business), Vicioso, DHECA, and John, has used a combination of wire fraud and extortion to steal funds from multiple other victims.

## COUNT I

### Common Law Fraud
(Against Lukas Kaczmarek and Olena Kotliarenko)

124.     Plaintiffs repeat and reallege the facts set forth in the paragraphs above as though fully set forth herein.

125.     Luke and Olena fraudulently and knowingly and/or recklessly made repeated false assertions to Lou, including but not limited to: Luke's purported legal advice concerning the validity of HoudiniSwap's nominee arrangement, Luke's falsified documentation concerning the validity of HoudiniSwap's nominee arrangement, Luke's false assertions concerning a $500,000 bridge loan, Olena's false representations she would act as HoudiniSwap's nominee, Olena's false representations that, serving as HoudiniSwap's nominee, she would solely execute documents at

Lou's direction, and Olena's false confirmation that she was acting solely as HoudiniSwap's nominee.

126.    The purpose of Defendants' statements was to engender a relationship of trust and repose with Lou, and to assure him that HoudiniSwap was operating under a valid nominee arrangement.  In reality, Defendants sought to wrest control of the Company from Lou and to abscond with any monetary opportunities the Company and/or Lou provided.

127.    Lou detrimentally relied on the representations made by Defendants and reasonably relied on those representations believing that they were made by bona fide agents and attorneys acting on his behalf and in his interest.

128.    Defendants' misrepresentations actually and proximately caused Lou significant damages.

129.    As a direct result of Defendants' actions, Lou has suffered compensable damages in excess of $12,000,000 to be determined at trial.

130.    Plaintiffs are entitled to punitive damages as a result of Defendants' fraud.

## COUNT II

### Aiding and Abetting Fraud
(Against René Vicioso, DHECA, Olena Kotliarenko, and John Reusing)

131.    Plaintiffs repeat and reallege the facts set forth in the paragraphs above as though fully set forth herein.

132.    As alleged above, Luke has made multiple false representations to Lou to defraud him of ownership of HoudiniSwap and any monetary opportunities arising from Luke's relationship with Lou.

133.    Vicioso, DHECA, Olena, and John had actual knowledge of Luke's fraud or, at a minimum, consciously avoided knowledge of the fraud.

134.    Vicioso, DHECA, Olena, and John have further encouraged, incited, aided and/or abetted those acts of fraud by participating in schemes designed to advance the fraud, such as participating in HoudiniSwap's purported nominee arrangement, participating in schemes to demand payment from Lou, and representing Defendants to be the rightful owners of HoudiniSwap to third parties.

135.    As a direct result of Defendants' actions, Lou has suffered compensable damages in excess of $12,000,000 to be determined at trial.

136.    Plaintiffs are entitled to punitive damages as a result of Vicioso, DHECA, Olena, and John's conduct in assisting and concealing Luke's fraud.

## COUNT III

### Civil Conspiracy
(Against Lukas Kaczmarek, René Vicioso,
DHECA, Olena Kotliarenko, and John Reusing)

137.    Plaintiffs repeat and reallege the facts set forth in the paragraphs above as though fully set forth herein.

138.    As alleged above, since June 2023, Luke, Vicioso, Olena, and John entered into an agreement to defraud Lou of, *inter alia*, his ownership of HoudiniSwap and any other monetary opportunities Luke's relationship with Lou provided.

139.    Through their agreement, Defendants have sought to wrest control of HoudiniSwap away from Lou, including through falsified documents.  Defendants have also sought to pressure Lou to settle by falsely representing Defendants' ownership of HoudiniSwap and by communicating false and damaging information to HoudiniSwap's prospective purchasers to increase their leverage over Lou.

140.    Defendants participated in, knew, or were aware of the tortious acts underlying their conspiracy.  Those tortious acts included Luke's and Olena's fraud against Lou, and Luke, Vicioso,

DHECA, and John's tortious interference with Lou and HoudiniSwap's business relations and economic opportunities.

141.    As a direct result of Defendants' actions, Lou has suffered compensable damages in excess of $12,000,000 to be determined at trial.

142.    Plaintiffs are entitled to punitive damages as a result of Defendants' conspiracy to defraud Plaintiffs and to tortiously interfere with Plaintiffs' business relations and economic opportunities.

**COUNT IV**

**Civil RICO, 18 U.S.C. §§ 1962(c), 1964(c)**
(Against Lukas Kaczmarek, Local Network Knowledge,
René Vicioso, DHECA, and John Reusing)

143.    Plaintiffs repeat and reallege the facts set forth in the paragraphs above as though fully set forth herein.

144.    Luke, LNK, Vicioso, DHECA, and John have formed an association-in-fact RICO enterprise, the purpose of which is to obtain illegally funds and other lucrative opportunities from Luke's so-called "wayward" crypto clients, whom he solicited through his nominally legitimate venture, LNK.

145.    Defendants' racketeering activities have been ongoing since at least 2023. Defendants' racketeering activities include wire fraud and extortion against multiple victims over at least the past two years. Based on Plaintiffs' investigation to date, Defendants' RICO enterprise and racketeering conduct appear to be ongoing, with new fraudulent conduct against multiple other victims still being uncovered.

146.    Defendants have engaged in at least two RICO predicate acts against Plaintiffs—*first*, multiple counts of wire fraud, consisting of (a) intentional misrepresentations by Luke concerning memorializing the HoudiniSwap nominee arrangement, (b) intentional

misrepresentations by Luke to Lou via WhatsApp and Telegram messages to obtain Lou's signature on documents purporting to transfer ownership and control of HoudiniSwap from Lou to Olena, and (c) intentional misrepresentations by Luke that he would solicit a buyer for HoudiniSwap for Lou's benefit; and *second*, extortion by Luke, Vicioso, and DHECA against Lou on or around May 30, 2025, demanding a payment of $4 million based on a threat of criminal prosecution.

147.    Plaintiffs have suffered clear and definite RICO injury, including incurring in excess of $189,211.96 in attorney's fees to vindicate their rights over Lou's rightful ownership of HoudiniSwap.  Lou has also suffered clear and definite injury based on his loss of $150,000 based on Luke's use of wire fraud to obtain and then "yield farm" Lou's $500,000 loan.

148.    As a direct result of Defendants' actions, Lou has suffered compensable damages in excess of $12,000,000 to be determined at trial.

149.    By reason of this violation of 18 U.S.C. § 1962(c), Plaintiffs are entitled to recover from Defendants treble damages, plus interest, costs, and attorneys' fees.

### COUNT V

**RICO Conspiracy, 18 U.S.C. §§ 1962(d), 1964(c)**
(Against Lukas Kaczmarek, Local Network Knowledge,
René Vicioso, DHECA, Olena Kotliarenko, and John Reusing)

150.    Plaintiffs repeat and reallege the facts set forth in the paragraphs above as though fully set forth herein.

151.    As alleged above, Luke, LNK, Vicioso, DHECA, Olena, and John have each entered into, agreed, and intended to advance the purpose of the RICO scheme alleged herein, including by participating to advance the RICO enterprise's purpose of illegally extracting money and lucrative opportunities from Luke's crypto clients, including Lou, using racketeering predicate acts.

152.    No Defendant has withdrawn, or otherwise dissociated itself, from the conspiracy at issue or the other conspirators.

153.    Plaintiffs have been injured in business or property as a result of Defendants' violations of 18 U.S.C. § 1962(d).

154.    As a direct result of Defendants' actions, Lou has suffered compensable damages in excess of $12,000,000 to be determined at trial.

155.    As a result of Defendants' violations of 18 U.S.C. § 1962(d), Plaintiffs are entitled to treble damages, plus interest, costs, and attorneys' fees.

<u>**COUNT VI**</u>

**Fraud in the Execution/Fraud in the Factum**
(Against Lukas Kaczmarek and Olena Kotliarenko)

156.    Plaintiffs repeat and reallege the facts set forth in the paragraphs above as though fully set forth herein.

157.    Luke and Olena fraudulently and knowingly and/or recklessly induced Lou to sign Transfer and Assignment Agreement and the Independent Contractor Agreement by making material, intentional misrepresentations and/or intentionally failing to provide material information, including representing both before and after Lou executed these agreements that HoudiniSwap had installed a valid nominee arrangement, and that Olena was serving as the HoudiniSwap nominee.

158.    Accordingly, the Transfer and Assignment Agreement and the Independent Contractor Agreement, and any other alleged agreements purporting to transfer ownership of HoudiniSwap from Lou to Olena, are void *ab initio* for fraud in the factum and all subsequent transfers are also null and void.

159.    Plaintiffs are also entitled to actual, compensatory and punitive damages, interest, and costs and disbursements for Defendants' fraudulent acts and omissions.

160.    Plaintiffs seek a declaration that the Transfer and Assignment Agreement and the Independent Contractor Agreement, and any other alleged agreements purporting to transfer ownership of HoudiniSwap from Lou to Olena, are void *ab initio* and all subsequent transfers are also null and void.

## COUNT VII

### Fraudulent Inducement
(Against Lukas Kaczmarek and Olena Kotliarenko)

161.    Plaintiffs repeat and reallege the facts set forth in the paragraphs above as though fully set forth herein.

162.    Luke and Olena fraudulently and knowingly and/or recklessly induced Lou to sign Transfer and Assignment Agreement and the Independent Contractor Agreement by making material, intentional misrepresentations and/or intentionally failing to provide material information, including representing both before and after Lou executed these agreements that HoudiniSwap had installed a valid nominee arrangement, and that Olena was serving as the HoudiniSwap nominee.

163.    Lou reasonably relied on Luke's and Olena's misrepresentations and omissions.

164.    Luke's and Olena's conduct evidenced a high degree of moral culpability and was so flagrant as to transcend mere carelessness; and/or constituted willful or wanton negligence or recklessness.

165.    Accordingly, in the alternative to the relief requested in Count VI (fraud in the execution/fraud in the factum), Lou is entitled to rescission of the Transfer and Assignment Agreement and the Independent Contractor Agreement, and any other alleged agreements

purporting to transfer ownership of HoudiniSwap from Lou to Olena, based on Luke's fraud in the inducement. In addition, all subsequent agreements purporting to transfer ownership of HoudiniSwap to Luke, and then to DHECA, should be rescinded and declared of no legal effect.

166.    Lou is also entitled to actual, compensatory, and punitive damages, interest, and costs and disbursements.

## COUNT VIII

### Breach of Contract
(Against Lukas Kaczmarek)

167.    Plaintiffs repeat and reallege the facts set forth in the paragraphs above as though fully set forth herein.

168.    As alleged above, on October 11, 2023, Lou approached Luke for his services to locate an individual to serve as HoudiniSwap's nominee.

169.    Luke consented to provide his services and to identify someone who will act as a nominee for Lou, as memorialized through WhatsApp and Telegram messages. In exchange, Luke had access to Lou's contacts in the cryptocurrency community.

170.    On January 8, 2024, Luke separately offered to provide the "full service" of acting on behalf of any HoudiniSwap nominee to ensure that the arrangement was satisfactory to Lou. Lou agreed and continued to uphold his end of the arrangement by giving Luke access to business opportunities.

171.    As a result of the foregoing, there is a valid, binding, and enforceable contract between Lou and Luke requiring Luke to maintain a valid nominee arrangement on Lou's behalf.

172.    Luke breached the contract by failing to maintain a valid nominee arrangement that would act in HoudiniSwap's or Lou's interests.

173.    Luke's breach is the actual and proximate cause of Lou's damages.

174.    As a result of Defendant's actions, Lou has suffered compensable damages in excess of $12,000,000 to be determined at trial.  Further, as a matter of equity, Louis entitled to an order requiring Luke to specifically perform his obligations under the parties' oral contract.

## COUNT IX

### Declaratory Judgment
(Against Lukas Kaczmarek, René Vicioso,
DHECA, Olena Kotliarenko, and John Reusing)

175.    Plaintiffs repeat and reallege the facts set forth in the paragraphs above as though fully set forth herein.

176.    As alleged above, there is an actual controversy over which party is the lawful owner of HoudiniSwap.  At all relevant times, Lou has maintained that he is the rightful owner of HoudiniSwap, and was induced to execute the alleged ownership transfer documents on the false belief and understanding that they memorialized a valid nominee arrangement.

177.    In truth, Lou is the rightful, sole owner of HoudiniSwap.  Lou never transferred ownership of HoudiniSwap to Olena:  there was no meeting of minds or mutual assent to effectuate a transfer ownership; no consideration was exchanged; and the nature of the purported transfer documents was misrepresented to Lou, rendering any purported transfer void ab initio and all subsequent transfers null and void.  Alternatively, Lou's signature to the purported transfer documents was procured by fraud and material misrepresentations; therefore, Lou is entitled to rescission of the purported transfer documents and all subsequent transfers and documents purporting to memorialize or ratify a transfer or ownership (*e.g.*, the HoudiniSwap Resolution) (which were made in bad faith and with knowledge of the fraud) are also void.

178.    In accordance with the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202, and Md. Code Ann., Cts. & Jud. Proc. § 3-403, Plaintiffs seek a declaration that Lou is the

rightful owner of HoudiniSwap, and that none of the documents purporting to transfer ownership or control of HoudiniSwap to any of the Defendants is valid or enforceable.

## COUNT X

### Tortious Interference with Business Relations
(Against Lukas Kaczmarek, René Vicioso, DHECA, and John Reusing)

179.    Plaintiffs repeat and reallege the facts set forth in the paragraphs above as though fully set forth herein.

180.    As alleged above, Luke, Vicioso, DHECA, and John have taken intentional and willful acts to interfere with and impair Lou's ownership rights and commercial opportunities with HoudiniSwap.    Those intentional acts include communicating directly with HoudiniSwap's contractors in an effort to freeze out Lou from managing his own company, and communicating false and damaging information to HoudiniSwap's potential purchasers to impair or terminate the deal.

181.    Those intentional acts were calculated to cause economic harm to Plaintiffs to extract monetary benefits by force.  There is no lawful or justifiable cause, privilege, or excuse for Defendants' conduct.

182.    As a result of Defendants' actions, Lou has suffered compensable damages in excess of $12,000,000 to be determined at trial.

183.    Unless Defendants' wrongful conduct is restrained and enjoined, Plaintiffs will suffer irreparable injury, for which it has no adequate remedy at law.

## COUNT XI

### Breach of Fiduciary Duty
(Against Lukas Kaczmarek)

184.    Plaintiffs repeat and reallege the facts set forth in the paragraphs above as though fully set forth herein.

185.    Luke repeatedly held himself out to be a trusted advisor and attorney to Lou.  As Lou's advisor and attorney, he owed a fiduciary duty of care, good faith, and loyalty to Lou and to act in Lou's best interests.

186.    Luke repeatedly violated that duty by, among other steps, taking steps to benefit himself at Lou's expense, including misrepresenting the validity of the HoudiniSwap nominee arrangement, engaging in efforts to wrest control of HoudiniSwap away from Lou, attempting to extort a $4 million payment from Lou for his own benefit, and using Lou's funds to try to "yield farm" a profit for himself.

187.    As a result of Defendant's actions, Lou has suffered compensable damages in excess of $12,000,000 to be determined at trial.

## COUNT XII

### Legal Malpractice
(Against Lukas Kaczmarek)

188.    Plaintiffs repeat and reallege the facts set forth in the paragraphs above as though fully set forth herein.

189.    Luke was engaged as Lou's attorney to serve as corporate counsel to advise on, *inter alia*, corporate governance issues, establishing and maintaining a valid nominee arrangement, and as a general transactional attorney.

190.    Luke repeatedly violated that duty by, among other steps, taking steps to benefit himself at Lou's expense, including misrepresenting the validity of the HoudiniSwap nominee arrangement, engaging in efforts to wrest control of HoudiniSwap away from Lou, attempting to extort a $4 million payment from Lou for his own benefit, and using Lou's funds to try to "yield farm" a profit for himself.

191.    Luke's violation of his duties as Lou's attorney are the actual and proximate cause of Lou's damages.

192.    As a result of Defendant's actions, Lou has suffered compensable damages in excess of $12,000,000 to be determined at trial.

## COUNT XIII

**Computer Fraud and Abuse Act, 18 U.S.C. §§ 1030(a)(2), (a)(4), (a)(5)(B), (c)(4)(A)(i)(I)**
(Against Lukas Kaczmarek)

193.    Plaintiffs repeat and reallege the facts set forth in the paragraphs above as though fully set forth herein.

194.    As alleged above, Luke knowingly, intentionally, and without authorization, accessed HoudiniSwap's password-protected Google Drive account through the Internet.

195.    Luke accessed, without authorization, HoudiniSwap's Google Drive account to download and steal HoudiniSwap's confidential business records and proprietary information, which he would then use to defraud and extort Lou and HoudiniSwap.

196.    As a result of Luke's unauthorized access into HoudiniSwap's Google Drive, he caused foreseeable harm and damage to Lou and to HoudiniSwap.  To date, Lou and HoudiniSwap have expended at least $5,000 in fees within the past two months to identify and remediate the harm of Luke's unauthorized access and theft of HoudiniSwap's confidential business documents and proprietary trade secrets.

197.    Plaintiffs are entitled to compensatory and consequential damages arising from Luke's unauthorized access to HoudiniSwap's computer systems, theft of HoudiniSwap's confidential information, and improper use of that confidential information.

## COUNT XIV

### Computer Fraud and Abuse Act Conspiracy, 18 U.S.C. §§ 1030(b), (c)(4)(A)(i)(I)
(Against René Vicioso, DHECA, and John Reusing)

198.    Plaintiffs repeat and reallege the facts set forth in the paragraphs above as though fully set forth herein.

199.    As alleged above, Luke knowingly, intentionally, and without authorization, accessed HoudiniSwap's password-protected Google Drive account through the Internet.

200.    Luke accessed, without authorization, HoudiniSwap's Google Drive account to download and steal HoudiniSwap's confidential business records and proprietary information, which he would then use to defraud and extort Lou and HoudiniSwap.

201.    As a result of Luke's unauthorized access into HoudiniSwap's Google Drive, he caused foreseeable harm and damage to Lou and to HoudiniSwap.  To date, Lou and HoudiniSwap have been harmed by expending at least $5,000 in fees within the past two months to identify and remediate the harm of Luke's unauthorized access and theft of HoudiniSwap's confidential business documents and proprietary trade secrets.

202.    Vicioso and DHECA conspired to commit Luke's knowing, intentional, and unauthorized access of HoudiniSwap's password-protected Google Drive through the Internet in order to download and steal HoudiniSwap's confidential business records and proprietary information, which Luke, Vicioso, and DHECA would then use to defraud and extort Lou and HoudiniSwap.

203.    Vicioso and DHECA did not, at any point, withdraw from the aforementioned conspiracy.

204.    As a result of Defendants' conspiracy to gain unauthorized access into HoudiniSwap's Google Drive and to download and steal HoudiniSwap's files therein, Lou and

HoudiniSwap have been harmed by expending at least $5,000 in fees within the past two months to identify and remediate the harm of Luke's unauthorized access and theft of HoudiniSwap's confidential business documents and proprietary trade secrets.

205.    Plaintiffs are entitled to compensatory and consequential damages arising from Luke's unauthorized access to HoudiniSwap's computer systems, theft of HoudiniSwap's confidential information, and improper use of that confidential information.

## COUNT XV

### Permanent Injunction
(Against Lukas Kaczmarek, René Vicioso,
DHECA, Olena Kotliarenko, and John Reusing)

206.    Plaintiffs repeat and reallege the facts set forth in the paragraphs above as though fully set forth herein.

207.    As alleged above, at all relevant times, Lou has maintained that he is the rightful owner of HoudiniSwap, and was induced to execute the alleged ownership transfer documents on the false belief and understanding that they memorialized a valid nominee arrangement.  This false understanding is the product of Defendants' fraudulent conduct.

208.    As a result of Defendants' actions, Lou has been irreparably harmed by losing quiet title to his ownership of HoudiniSwap.  Damages are insufficient to compensate Lou for the ownership of, and quiet title to, HoudiniSwap, along with its intellectual property and goodwill engendered by the Company.  The balance of hardships and the public interest weigh in favor of a permanent injunction against Defendants from claiming ownership over HoudiniSwap or otherwise interfering with HoudiniSwap's personnel or business on the basis of their false claim of ownership.

## COUNT XVI

### Constructive Trust
(Against Lukas Kaczmarek, René Vicioso, DHECA, and Olena Kotliarenko)

209.    Plaintiffs repeat and reallege the facts set forth in the paragraphs above as though fully set forth herein.

210.    In the alternative to the declaratory relief sought above, should the Court find that legal title to HoudiniSwap was effectively transferred from Lou to Defendants, Plaintiffs assert that such transfer is the result of Defendants' fraudulent and inequitable conduct.  Under the circumstances, in the interests of equity and fairness, Plaintiffs seek a constructive trust in their favor over all ownership interests with respect to HoudiniSwap.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for the following relief:

a.    General and/or compensatory damages in excess of $12,000,000 to be determined at trial;

b.    Incidental and consequential damages to be determined at trial;

c.    Punitive damages in an amount to be determined at trial;

d.    RICO treble damages pursuant to 18 U.S.C. § 1964(c);

e.    Declaratory judgment that any purported transfer of ownership over HoudiniSwap from Louis Goldberg to Olena Kotliarenko and any documents memorializing or ratifying such purported transfer, and any subsequent transfers thereafter, are of no force or effect and void or, alternatively, an order of rescission with respect to all purported transfers;

f.      Declaratory judgment that Plaintiff Louis Goldberg is the sole owner of HoudiniSwap LLC or, ultimately, imposition of a constructive trust in favor of Plaintiff Louis Goldberg upon all ownership interests with respect to HoudiniSwap;

g.      Specific performance of contract requiring maintenance of nominee arrangement in Plaintiff Louis Goldberg's interests;

h.      CFAA damages and equitable and injunctive relief pursuant to 18 U.S.C. § 1030(c);

i.      Preliminary and permanent injunction enjoining Defendants from claiming ownership of HoudiniSwap or otherwise interfering with HoudiniSwap's personnel, business, or actual or prospective business relationships;

j.      Expedited proceedings and declaratory judgment in Plaintiffs' favor that Plaintiff Louis Goldberg is the sole owner of HoudiniSwap LLC;

k.      Attorney's fees, costs, disbursements, and pre- and post-judgment interest; and

l.      Any further legal and equitable relief as the Court deems appropriate.

## <u>DEMAND FOR A JURY TRIAL</u>

Plaintiffs request trial by jury of all issues so triable.

Dated:  July 28, 2025

Respectfully submitted,

By: _/s/ Douglas F. Gansler_____
Martin J. Weinstein (*pro hac vice forthcoming*)
Douglas F. Gansler (MD Bar No. 21010)
CADWALADER, WICKERSHAM & TAFT LLP
1919 Pennsylvania Avenue NW
Washington, DC 20006
Tel.:  (202) 862-2200
Fax:  (202) 862-2400
martin.weinstein@cwt.com
douglas.gansler@cwt.com

Adam K. Magid (*pro hac vice forthcoming*)
Andrew D. Huynh (*pro hac vice forthcoming*)
CADWALADER, WICKERSHAM & TAFT LLP
200 Liberty Street
New York, NY 10281
Tel.:  (212) 504-6000
Fax:  (212) 504-6666
adam.magid@cwt.com
andrew.huynh@cwt.com

*Counsel for Plaintiffs Louis Goldberg and HoudiniSwap LLC*